IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CAPWEALTH ADVISORS, LLC,    )
         )
   Plaintiff,        )
         )     NO. 3:21-cv-00036
v.         )     JUDGE RICHARDSON
         )
TWIN CITY FIRE INSURANCE    )
COMPANY,        )
         )
   Defendant.      )

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's motion for summary judgment (Doc. No. 42, the "Motion,"), supported by an accompanying memorandum (Doc. No. 43). Plaintiff filed a response (Doc. No. 46), and Defendant filed a reply (Doc. No. 52). For the reasons stated herein, Defendant's motion is granted.

## BACKGROUND

This is a dispute over Defendant Twin City Fire Insurance Company's denial of insurance coverage for Plaintiff CapWealth Advisors LLC's request for coverage stemming from an investigation and enforcement action by the Securities and Exchange Commission ("SEC"). This case is one of those relatively rare ones in which the facts material to resolve the pending Motion are not in dispute. Instead, the disagreement among the parties is over the interpretation of the insurance policy at issue.

### 1. Relevant Entities and Individuals

Plaintiff CapWealth Advisors LLC ("CapWealth") is an investment advisor registered with the SEC. (Doc. No. 47 at 1). CapWealth Investment Services ("CWIS") is CapWealth's former

affiliated introducing broker.[1] (*Id.* at 2). Timothy Pagliara is CapWealth's founder, chairman, and investment officer, as well as an investment advisor representative of CapWealth. (*Id.* at 1). Timothy Murphy also is an investment advisor representative of CapWealth. (*Id.* at 2).[2] From at least June 2015 to June 2018, Pagliara and Murphy were also registered representatives of CWIS. (*Id.*).

Until its closure in 2018, CWIS placed orders for shares of mutual funds on behalf of CapWealth's clients. (*Id.*). To the extent that any of the mutual funds whose shares were purchased on behalf of CapWealth's clients were subject to fees pursuant to Rule 12b-1 of the Investment Company Act of 1940,[3] CWIS received those fees (from the mutual fund(s)). (*Id.* at 3). Pagliara

---

[1] Neither CapWealth nor Twin City define the term "introducing broker" in their respective filings. However, courts have recognized an introducing broker to be "a firm that has the initial contact with the public customer. The customer typically places his or her order with the introducing broker." *See Katz v. Financial Clearing & Services Corp.*, 794 F. Supp. 88, 90 (S.D.N.Y. 1992).

[2] In its memorandum in support of its Motion, CapWealth refers to CapWealth, Pagliara, and Murphy collectively as the "Insureds." (Doc. No. 43). For clarity, the Court herein refers to CapWealth, Pagliara, and Murphy each separately, in his (or its) respective own capacity, though the Court acknowledges that each is insured by the Policy. The Court also notes that Pagliara and Murphy are not parties to this action.

[3] As explained on an SEC webpage:

> So-called "12b-1 fees" are fees paid out of mutual fund or ETF assets to cover the costs of distribution – marketing and selling mutual fund shares – and sometimes to cover the costs of providing shareholder services.
>
> 12b-1 fees get their name from the SEC rule that authorizes a fund to charge them. The rule permits a fund to pay these fees out of fund assets only if the fund has adopted a plan ("12b-1 plan") authorizing their payment.
>
> "Distribution fees" include fees to compensate brokers and others who sell fund shares and to pay for advertising, the printing and mailing of prospectuses to new investors, and the printing and mailing of sales literature.
>
> "Shareholder Service Fees" are fees paid to persons to respond to investor inquiries and provide investors with information about their investments. Shareholder service fees can also be paid outside of 12b-1 fees.

and Murphy, as representatives of CWIS, received a portion of any 12b-1 fees (paid by mutual funds but indirectly ultimately incurred by CapWealth clients who purchased and retained shares of such mutual funds) and received by CWIS. (*Id.*).

## 2. The SEC Investigation and Enforcement Action

On January 14, 2020, the SEC sent a letter to Pagliara and Phoebe Venable, CapWealth's Chief Executive Officer ("CEO"), advising them that it was investigating a possible violation of securities laws. (*Id.*). On the same day, the SEC sent a letter to CapWealth requesting the production of documents relevant to the investigation; the request specifically referenced 12b-1 fees. (*Id.* at 5–6).

On January 28, 2020, the SEC issued a formal investigative order in the SEC investigation. (*Id.* at 6). Several months later, on May 13, 2020, the SEC issued a separate Wells Notice[4] to each of CapWealth, Pagliara, and Murphy respectively. (*Id.* at 7). Each of the Wells Notices informed

---

https://www.investor.gov/introduction-investing/investing-basics/glossary/distribution-andor-service-12b-1-fees#:~:text=So%2Dcalled%20%E2%80%9C12b%2D1,a%20fund%20to%20charge%20them. (last accessed March 28, 2023). Notably, because 12b-1 fees are paid out of fund assets, their payment by a fund necessarily reduced the value of fund assets as a whole, this reducing the value of the portion of the fund held by anyone who had purchased and retained shares in the fund.

The theory behind the below-referenced SEC investigation and enforcement action appears to be that a conflict of interest existed for certain persons (like Pagliara and Murphy and CapWealth itself) associated with both CapWealth and CWIS, because essentially (i) Pagliara and Murphy made money from 12b-1 distribution fees paid by funds; (ii) CWIS would prefer to be a broker on purchases for funds paying relatively high 12b-1 distribution fees; (iii) CWIS, due to having associated persons in common with CapWealth, could influence CapWealth to steer CapWealth's client's toward such higher-fee funds; and (iv) which means that persons having both a financial interest in CWIS and the ability to steer CapWealth clients toward a particular fund (like, potentially, Pagliara, Murphy or CapWealth itself) would be doing such steering of CapWealth's clients under a conflict of interest. The Court notes, however, that to the extent it is misconstruing the conflict-of-interest theory in any way, that would not materially affect the soundness of the Court's analysis of the issues raised by the instant Motion.

[4] "A Wells Notice is a notice that the SEC sends to an individual or entity at the conclusion of an investigation informing the recipient that the SEC's enforcement division intends to recommend an enforcement action against them." *Fries v. Northern Oil and Gas, Inc.*, 285 F. Supp. 3d 706, 712 n.3 (S.D.N.Y. 2008). Notably, the recommendation is from the so-called "staff" of the SEC's Enforcement Division to the Commissioners of the SEC; in that sense it is a recommendation from one component of the SEC to the SEC's governing body.

the respective recipient that the SEC had recommended that the Commission (*i.e.* the SEC) file an enforcement action against them. (*Id.* at 7–8). As to Pagliara and Murphy, their respective Wells Notices stated in part:

> The facts that we believe support charges against you include, among others: (1) failing to fully and fairly disclose to advisory clients of CapWealth Advisors, LLC your mutual fund share class selection practices and the conflicts of interest created by the 12b-1 fees incurred by advisory clients' accounts; and (2) failing to obtain best execution for advisory clients in their mutual fund share class investments.

(*Id.* at 8 (quoting Doc. Nos. 42-10, 42-11)). On December 11, 2020, the SEC filed a complaint against CapWealth, Pagliara, and Murphy. (*Id.* at 9). The SEC complaint alleges that from June 2015 through June 2018, CapWealth, Pagliara, and Murphy "purchased, recommended, or held for advisory clients mutual fund share classes that charged fees pursuant to 12b-1 under the Investment Company Act of 1940 ("12b-1 fees"), even though lower-cost share classes of the same funds were available." (Doc. No. 42-14 at 2–3). It goes onto explain that allegedly "CapWealth's affiliated broker-dealer [CWIS] received 12b-1 fees from these investments and shared portions of the fees with Pagliara and Murphy, who were registered representatives of the broker-dealer." (*Id.* at 3). According to the SEC complaint, CapWealth, Pagliara, and Murphy failed to disclose "adequately the material conflicts of interests with respect to the 12b-1 fees Pagliara and Murphy received, through CapWealth's affiliated broker-dealer [CWIS], from their advisory clients' investments in mutual funds." (*Id.*). According to the complaint, this prevented the advisory clients from providing informed consent as to the conflicts. (*Id.*). More specifically, "Defendants failed to disclose the economic incentive underlying their share class selections for clients such that the clients could decide whether or not to consent to a conflict that would result in them paying more for their mutual fund investments." (*Id.* at 15).

### 3. The Insurance Policy

Defendant Twin City Fire Insurance Company ("Twin City") issued a Hartford Asset Management Choice Policy (Doc. No. 42-15, "Policy") to CapWealth for the period of August 14, 2019 to September 23, 2020. (Doc. No. 47 at 13). Pagliara and Murphy were also insured under the Policy.[5] (*Id.* at 17). Specifically, the Policy provides Investment Adviser Professional Liability, Investment Adviser Management Liability, and Network Security Liability coverage. (*Id.*). The Policy provides coverage for certain claims, which the policy defines to include "any" "administrative or regulatory proceeding[s] against, or investigation of any Insured commenced by" "the filing of a notice of charges, formal investigation or Wells Notice naming such Insured."[6] (*Id.* at 13–14 (quoting Doc. No. 42-15 at 55)). The Policy, by way of endorsement, contains a Specific Entity Exclusion (the "Exclusion"). (*Id.*). The Exclusion states that Twin City "shall not pay any Loss for any Claim":

> by or against, or based upon, arising from, or in any way related to any of the following entity(ies), including, but not limited to, any, subsidiary, trustee, receiver, assignee, director, officer, employee, shareholder, or beneficiary thereof: CapWealth Investment Services, LLC [CWIS].

---

[5] Though the parties do not explicitly state that CWIS is not insured under the Policy, the parties imply that the relevant insureds for present purposes are limited to CapWeatlh, Pagliara, and Murphy. (Doc. Nos. 47 at 12, 43 at 5). This would suggest that CWIS is not insured under the Policy, and the Court's own review of the Policy (Doc. No. 42-15) suggests that CWIS is not an insured.

[6] In the practical sense, the term "claim" can be used in this case in two different senses. On the one hand, under the definition contained in the Policy, the "claim" is plainly the action brought by the SEC. However, in fact patterns like the one involved in this case, the term "claim" can be used alternatively to refer the insurance claim for which CapWealth seeks coverage from Twin City. And indeed, the parties use "claim" to refer both to the SEC investigation and enforcement action and CapWealth's request for insurance coverage for the SEC investigation and enforcement action. To avoid confusion, where the Court refers to a "claim" herein it refers to a "claim" as defined in the Policy. With respect to what CapWealth now seeks coverage for, the Court will refrain from referring to this as a "claim" and will instead refer to it as a "request for coverage."

(Doc. No. 42-15at 38). On May 15, 2020, counsel for CapWealth, Pagliara, and Murphy sent a letter to Twin City notifying Twin City of a request for coverage that had arisen under the Policy due to the SEC investigation and enforcement action and related receipts of the Wells Notices. (Doc. No. 47 at 17). Over the course of several months in 2020, Twin City notified CapWealth and Pagliara that the Policy did not provide coverage for the Wells Notices and SEC investigation and enforcement action due to the Specific Entity Exclusion.[7] (*Id.* at 21–22).

On December 16, 2020, CapWealth filed a complaint in the Chancery Court for Davidson County, Tennessee, alleging that Twin City breached the Policy when it denied CapWealth's request for coverage with respect to the SEC enforcement action. (Doc. No. 1-1). Twin City removed the action to this Court on January 15, 2021. (Doc. No. 1).

Twin City has moved for summary judgment on all counts.[8] (Doc. No. 42). CapWealth filed a timely response. (Doc. No. 46). Therefore, the pending motion for summary judgment is now ripe for resolution.

<u>SUMMARY JUDGMENT STANDARDS</u>

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

---

[7] The statement of undisputed facts (Doc. No. 47) does not state that Twin City notified Murphy of its denial of coverage. The Court does not know why this detail is omitted and neither party addresses the omission. Nonetheless, whether Murphy was notified does not affect the Court's analysis or its ability to interpret the Policy.

[8] The complaint contains three counts. Count I alleges that Twin City breached the Policy. (Doc. No. 1-1 at 14). Count II is a claim for declaratory judgment requesting that the Court declare that the claim is covered by the Policy. (*Id.* at 14–15). Count III is a claim for a statutory penalty alleging that Twin City refused coverage in bad faith. (*Id.* at 15–16).

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[9] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at

---

[9] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322).

This case presents the relatively unusual scenario in which no material facts are in dispute between the parties. The only questions yet to be resolved are questions of law for the Court—regarding, as explained below, interpretation of the phrase "in any way related to" as contained in the Policy—to be answered in light of the undisputed facts. *See For Senior Help, LLC v. Westchester Fire Insurance Company*, 451 F. Supp. 3d 837, 844 (M.D. Tenn. 2020) ("Under Tennessee law, '[t]he question of the extent of insurance coverage is a question of law involving the interpretation of contractual language'") (quoting *Clark v. Sputniks*, 368 S.W.3d 431, 441 (Tenn. 2012)); *Ramadan v. Gonzales*, 479 F.3d 646, 648 (9th Cir. 2007) ("A 'question of law' includes an issue of statutory construction as well as the application of law to undisputed facts."); *cf. Union Mfg. Co. v. N.L.R.B.*, 221 F.2d 532, 533 (D.C. Cir. 1955) ("The facts were stipulated, and the question before us is a question of law, one of statutory construction."). Thus, this case is particularly apt for resolution on summary judgment. *See AKF, Inc. v. Western Foot & Ankle Center*, 2022 WL 4538869, at *5 (E.D.N.Y. Sept. 28, 2022) ("It is well-established that the Court may decide all questions of law on summary judgment."); *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012) ("Questions of contract interpretation are generally considered to be questions of law, and thus are especially well-suited for resolution by summary judgment.") (citing *Ross Prods. Div. Abbott Labs. v. State*, No. M2006-01113-COA-R3-CV, 2007 WL 4322016, at *2 (Tenn. Ct. App. Dec. 5, 2007), perm. app. denied (Tenn. Apr. 28, 2008)).

DISCUSSION

**1. CapWealth's Request for Summary Judgment**

Before addressing the merits, the Court first feels compelled to address a procedural oddity in this case. CapWealth, in its response to Twin City's motion for summary judgment, requests that the Court grant summary judgment in CapWealth's favor. (Doc. No. 46 at 26). Strikingly, CapWealth has not moved for summary judgment, but instead suggests that the Court should *sua sponte* issue summary judgment in favor of CapWealth. (*Id.* at 12–13). On the one hand, it is true that after giving notice and a reasonable time to respond, a court may grant summary judgment to a nonmovant. Fed. R. Civ. P. 56(f)(1). And the Court takes CapWealth's point that if the Court were to determine that the Policy covered CapWealth's request for coverage, then there would remain no issue on the merits left to resolve in the case, and thus summary judgment on liability would be warranted in CapWealth's favor. (Doc. No. 46 at 12). It strikes the Court as odd, however, for a nonmovant to *request* the Court issue summary judgment in its favor and yet not move for summary judgment; after all, it is axiomatic that certain kinds of requests to a court (not least summary judgment) should be made by motion. And the Court does not feel as though it is speaking out of turn when it says that it does not believe Rule 56's purpose, in permitting the Court to *sua sponte* issue summary judgment, would be well served by granting summary judgment to a party that has failed to actually *move* for summary judgment, but instead requests summary judgment through its response in opposition to another party's motion for summary judgment. Ultimately, however, because the Court determines that Twin City, not CapWealth, is entitled to summary judgment, the Court need not determine whether, absent an actual motion for summary

judgment from CapWealth, it would be appropriate to give separate consideration to granting summary judgment in favor of CapWealth.

## 2. Twin City's Motion for Summary Judgment

Twin City moves for summary judgment on the grounds that the Policy, due to the inclusion of the Specific Entity Exclusion, bars coverage for CapWealth's request for coverage. (Doc. No. 43 at 12). By contrast, CapWealth asserts that the Court should interpret the Exclusion narrowly, and that such an interpretation does not bar coverage of its request for coverage. (Doc. No. 46 at 13). The crux of the disagreement between the parties is the interpretation of the phrase "in any way related to" as contained in the Exclusion. As noted above, the Exclusion states that Twin City "shall not pay any Loss for any Claim" "by or against, or based upon, arising from, or *in any way related to* any of the following entity(ies), including, but not limited to, any, subsidiary, trustee, receiver, assignee, director, officer, employee, shareholder, or beneficiary thereof: CapWealth Investment Services, LLC."[10] (Doc. No. 43 at 9 (quoting Doc. No. 42-15 at 38)) (emphasis added).

Twin City contends that the Policy, via the Exclusion, bars CapWealth's request for coverage because the request seeks coverage for the SEC investigation and enforcement action. (*Id.* at 8). As Twin City points out, the SEC investigation and enforcement action are based on undisclosed alleged conflicts of interest for Pagliara and Murphy due to their collection of 12b-1 fees through their positions as registered representatives of CWIS. (*Id.*). Therefore, according to Twin City, the claim is "related" to CWIS and thus barred due to the Exclusion. (*Id.*). Unsurprisingly, CapWealth has a different take. CapWealth asserts that the parties' intention was

---

[10] The parties do not appear to dispute that the SEC investigation and enforcement action otherwise constitute a "claim" under the policy. Therefore, the Court needs only to determine whether the Policy, via the Exclusion, bars coverage.

for the Exclusion to clarify that the Policy did not provide coverage *for* CWIS.. (Doc. No. 46 at 14) ("[T]he sole purpose of the exclusion form was to state explicitly what everyone understood: that the Policy did not provide coverage for the broker-dealer."). (*Id.* at 15).

CapWealth's argument, however, is ultimately unavailing. As discussed below, the Court finds that the Policy, due to the Exclusion, bars CapWealth's request for coverage because the claim falls within the contours of being "in any way related to" CWIS.

A.  Interpreting Insurance Policies Under Tennessee Law

"Tennessee law is clear that questions regarding the extent of insurance coverage present issues of law involving the interpretation of contractual language." *Garrison v. Bickford*, 377 S.W.3d 659, 663 (Tenn. 2012) (citations omitted). And under Tennessee law, "[i]nsurance contracts are subject to the same rules of construction as contracts generally[.]" *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012) (internal quotation marks and citation omitted). In discussing contract interpretation under Tennessee law, this Court has previously observed that

> "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). "If the language of the contract is clear and unambiguous," the Court will determine the parties' intent from the four corners of the contract by interpreting the contract "according to its plain terms as written" and "giv[ing] reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect." *Maggart v. Almany Realtors Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (citations omitted); *see also Union Realty Co. v. Family Dollar Stores of Tenn., Inc.*, 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007). The reasonable "meaning envisioned is the meaning which the average policy holder and insurer would attach to the policy language," and "[t]he language of an insurance contract must be read as a layman would read it." *S. Tr. Ins. Co. v. Phillips*, 474 S.W.3d 660, 667 (Tenn. Ct. App. 2015) (citations and internal quotation marks omitted). "The court, at arriving at the intention of the parties to a contract, does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written." *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992). In the absence of fraud or mistake, "courts should construe unambiguous written contracts as they find them," even if "the contract later proves

to be burdensome or unwise." *Ellis v. Pauline S. Sprouse Residuary Tr.*, 280 S.W.3d 806, 814 (Tenn. 2009) (citing *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002)).

*Burka v. Vanderbilt University Medical Center*, 550 F. Supp. 3d 530, 540–541 (M.D. Tenn. 2021).

As noted by the Court in *Burka*, contractual provisions "may be susceptible to more than one reasonable interpretation, rendering the terms of the contract ambiguous." *See id.* at 541 (quoting *Maggart*, 259 S.W. 3d at 704). The Court further observed that

> Not every dispute with respect to the proper interpretation of insurance policy language constitutes an ambiguity. An insurance policy is not ambiguous simply because the parties disagree about its meaning. Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to create an ambiguity. Rather, an objective test is applied to determine whether an ambiguity exists in an insurance policy. Generally, an ambiguity in insurance policy language exists only if the language is fairly or reasonably susceptible to two or more different, but reasonable, interpretations or meanings. A genuine uncertainty or honest difference must exist as to which of two or more meanings is proper; a policy is not ambiguous simply because "creative possibilities" as to its meaning can be suggested by the parties.

> A policy term will not be found to be ambiguous simply because it is not defined within the policy, or because it has more than one meaning, or a broad meaning. Additionally, the fact that an insurance policy is a complex instrument requiring analysis or the need to interrelate multiple and various policy provisions, will not alone create an ambiguity ....

> Generally, whether insurance policy language is ambiguous, and therefore requires interpretation or construction, is a question of law to be decided by the court[.]

*See id.* at 541 (quoting *Stonebridge Life Ins. Co. v. Horne*, No. W2012-00515-COA-R3-CV, 2012 WL 5870386, at *4–*5 (Tenn. Ct. App. Nov. 21, 2012)). "When the Court determines that 'the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the court[ ] must resort to other rules of construction.'" *See Burka*, 550 F. Supp. 3d at 542 (quoting *Planters Gin Co.*, 78 S.W.3d at 890). But if the rules of construction do not resolve the ambiguity, the Court may turn to extrinsic evidence or "parol evidence, including the contracting parties' conduct and statements regarding the disputed

provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co. v. Watson*,
195 S.W.3d 609, 612 (Tenn. 2006) (citations omitted).

As Plaintiff points out, "[w]hen a provision that purports to limit insurance is ambiguous,
it must be construed against the insurance company and in favor of the insured." *See Artist Bldg.
Partners v. Auto-Owners Mut. Ins. Co.*, 435 S.W.3d 202, 216 (Tenn. Ct. App. 2013) (quoting *Gates
v. State Auto Mut. Ins. Co.*, 196 S.W.3d 761, 764 (Tenn. Ct. App. 2005)).

B.  The Policy is Not Rendered Ambiguous by the Specific Entity Exclusion[11]

The Court must determine whether the Policy is rendered ambiguous by the Specific Entity
Exclusion due to the Exclusion's inclusion of the phrase "in any way related to."[12] As explained
above, a term is ambiguous when it is subject to two or more reasonable interpretations. *See Burka*,
550 F. Supp. 3d at 540–541 (citing *Maggart*, 259 S.W. 3d at 704). And although a "'word or

---

[11] The parties frame the issue of ambiguity as whether the Specific Entity Exclusion is ambiguous. However, the Court finds that the proper question (which the Court herein calls the "ambiguity question" for short) is whether *the Policy as a whole* is ambiguous—ambiguous, that is, not in the abstract, but with respect to the particular policy construction issue here involved, *i.e.*, whether the Policy excludes coverage for the claim (the SEC investigation and enforcement action). The Court realizes, however, that the answer to the ambiguity question turns primarily on whether the Exclusion's phrase "in any way related to" is ambiguous in the context of the particular claim here at issue. Importantly, though, analysis of the ambiguity question must take account of other parts of the policy as well, because even if *the Exclusion itself* is not ambiguous as to whether the Policy excludes coverage for the claim, conceivably language in other parts of the Policy could contradict the Exclusion on this issue and thereby create an ambiguity. Indeed, the Policy as a whole, inclusive of endorsements, and not just the Specific Entity Exclusion, dictates the full breadth of (and limitations on) the insureds' coverage under the Policy.

For purposes of clarity of the analysis, the Court generally refers to the parties' arguments herein as though the parties had argued that the *Policy* is ambiguous (rather than referring to what the parties actually argued, which is that the *Exclusion* is ambiguous).

[12] This Court has previously noted that whether a contract is ambiguous with respect to the issue in question in the litigation actually turns on a construction of the contract as a whole, and not necessarily solely one particular provision. *See Thornton v. Dutch Nats. Processing, LLC*, No. 3:20-CV-00159, 2022 WL 4359066, at *6 (M.D. Tenn. Sept. 20, 2022). That said, typically (as in *Dutch Nats. Processing*) there is one particular contract term that is primarily relevant to the ambiguity (or lack thereof) of a contract regarding the issue in question. Here, the Policy provision primarily applicable to the "ambiguity" issue to be decided—whether coverage for the "claim" at issue unambiguously is excluded—obviously is "in any way related to," but the Court's analysis below takes account of other relevant parts of the Policy that bear on the "ambiguity" issue to be decided.

expression in the contract may, standing alone, be capable of two meanings,' the 'language in a contract must be construed in the context of that instrument in the whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.'" *See Procraft Cabinetry, Inc. v. Sweet Home Kitchen and Bath, Inc.*, 348 F. Supp. 3d 752, 761 (M.D. Tenn. 2018) (quoting *Adkins v. Bluegrass Estates*, 360 S.W.3d 404, 412–13 (Tenn. Ct. App. 2011)). Further, "[a] 'strained construction [of the contract] will not be placed on the language used to find ambiguity where none exists.'" *See id.* (quoting *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002)).

In its memorandum in support of its Motion and reply, Twin City takes the position that the Policy is unambiguous, and therefore the Court must enforce the Exclusion as written without turning to extrinsic evidence. (Doc. Nos. 43 at 12–13, 52 at 5). Indeed, Twin City is of the view that based on the ordinary meaning of the words "in any way related to," the claim is plainly "related to" CWIS because the SEC investigation and enforcement action is based on Pagliara's and Murphy's alleged conflicts of interest as registered agents of CWIS. (Doc. No. 43 at 14).

In its response, CapWealth simply assumes that the Policy is made ambiguous by the phrase "in any way related to" without providing argument or explanation as to *why* this phrase makes the Policy susceptible to two or more reasonable interpretations. (Doc. No. 46). Ambiguity would strongly favor CapWealth; as CapWealth points out, if the Policy were ambiguous, the Court would construe the Policy against Twin City. (*Id.* at 13). Furthermore, if the Policy were ambiguous, the Court would likely be able to turn to the extrinsic evidence provided by CapWealth in its response to ascertain the intentions of the parties. (*Id.*).[13]

---

[13] Although CapWealth repeatedly relies on extrinsic evidence in its response to demonstrate the parties' alleged intent, the Court cannot look to extrinsic evidence to determine whether an ambiguity exists in the first place. Though not raised by CapWealth, the only exception to this rule is that, generally, a court may

However, because CapWealth provides no explanation as to *why* (supposedly) the phrase "in any way related to" is susceptible to two or more reasonable interpretations as to make the Exclusion, and in turn the Policy, ambiguous, the Court is left to do some guess work. The only alternative interpretation put forth by CapWealth is that "in any way related to . . . [CWIS]" actually means "against . . . [CWIS]." (Doc. No. 46 at 14–15). Indeed, CapWealth asserts that the "sole purpose of the exclusion" was to clarify that the "Policy did not provide coverage for the broker-dealer, CWIS." (*Id.* at 15). This argument—that the language "in any way related to. . . [CWIS]" should be interpreted to bar coverage only for claims *against* CWIS—is not a reasonable alternative interpretation.

First, as Twin City points out, courts, in construing contracts to evince the parties' intent, should give words their "usual, natural, and ordinary meaning." *Allstate Inc. Co. v. Jordan*, 16 S.W. 3d 777, 779 (Tenn. Ct. App. 1999). As the Second Circuit explained in *Coregis*,

> Webster's Dictionary defines "related" simply as "connected by reason of an established or discoverable relation." Webster's Third New International Dictionary, *supra*, at 1916. The word "relation," in turn, as "used esp[ecially] in the phrase 'in relation to,' " is defined as a "connection" to or a "reference" to. *Id.* at 1916. Courts have similarly described the term "relating to" as equivalent to the phrases "in connection with" and "associated with," *see Jackson v. Lajaunie*, 270 So.2d 859, 864 (La. 1972), and synonymous with the phrases "with respect to," and "with reference to," *see Phoenix Leasing, Inc. v. Sure Broad., Inc.,* 843 F. Supp. 1379, 1388 (D. Nev. 1994), *aff'd,* 89 F.3d 846 (9th Cir. 1996)
>
> . . ..

*See Coregis Inc.*, 241 F.3d at 128–129. Nothing in the Exclusion indicates that the parties intended the words in the phrase "in any way related to" to take on meaning different from their ordinary

---

consider extrinsic evidence when determining whether a *latent* ambiguity exists. *See Consolidated Rail Corp. v. Grand Trunk Western R. Co.*, 607 F. App'x 484, 494 (6th Cir. 2015). However, CapWealth does not argue that the Policy suffers from a latent ambiguity. Thus, the Court has no need to consider any extrinsic evidence before determining whether an ambiguity in fact exists. The Court therefore declines to consider extrinsic evidence before determining whether the Policy is ambiguous.

meaning. And as demonstrated, "related" has an ordinary meaning significantly broader than that connoted by CapWealth's interpretation. "Related to" is further modified by "in any way," and "the word any when read naturally. . . has an expansive meaning." *See W3i Mobile, LLC v. WestChester Fire Ins. Co.*, 632 F.3d 432, 437 (8th Cir. 2011). The Court therefore finds that the plain language indicates that the parties intended "related to" to "incorporate all reasonable definitions of the word" "related." *See id.* CapWealth's assertion that the parties *intended* the Exclusion merely to clarify existing coverage as contained in the Policy not only is unsupported by the plain language of the Policy, but also misses the point. As explained above, the Court relies *on the text as written* in order to arrive at the intention of the parties; it does not "attempt to ascertain the parties' state of mind at the time the contract was executed." *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992). Thus, the Court must rely on the plain text as evidence of the parties' intent as to the meanings of words contained in a contract (here, the Policy).

CapWealth's interpretation of "in any way related to" also creates surplusage and renders the Exclusion meaningless. This severely impairs CapWealth's interpretation because "it is a well-settled principle of contract interpretation that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." *See Local 377 Chauffeurs, Teamsters, Warehousemen, and Helpers of America v. Humility of Mary Health Partners*, 296 F. Supp. 2d 851, 860 (N.D. Ohio Aug. 3003). The Exclusion by its terms already excludes coverage for any "Loss for any Claim" "by or against . . . [CWIS]." (Doc. No. 43 at 9 (quoting Doc. No. 42-15 at 38)). In other words, the Exclusion already bars CapWealth from seeking coverage for a claim brought against CWIS. Thus, if the Court were to interpret "in any way related to" as doing nothing more than clarifying that "the Policy did not

provide coverage for the broker-dealer, CWIS," the Court would be rendering "against. . . [CWIS]" mere surplusage.

Strangely, CapWealth admits that its interpretation renders the Exclusion meaningless. In its response, it states that "[i]f the purpose of the Specific Entity Exclusion was, as Ms. Schoenwolff[14] has admitted, was [sic] to provide clarity that 'everyone was on the same page,' then the coverage available under the Policy *should be the same with or without the exclusion*." (Doc. No. 46 at 15) (emphasis added). But, as noted above, Courts should interpret contracts in a manner to give meaning to each provision and to avoid surplusage; this means construing exclusions (at least where, as here, it is reasonable to do so) as conveying something not conveyed in the Policy's coverage provisions.

Finally, in a footnote[15], CapWealth asserts that courts have repeatedly found Twin City's "arising out of language" to be broad and vague. But *Twin City Fire Insurance Co. v. Vonachen Services, Inc.*, 567 F. Supp. 3d 979 (C.D. Ill. 2021), which CapWealth cites in support of this proposition, is inapposite. True, the court noted that Illinois courts had "consistently found that the language 'arising out of' is a broad and vague phrase," but when the court turned to interpret the phrase "in any way related to," it found it to be "incredibly broad, suggesting only a minimal connection is necessary" and that the "plain reading of that phrase" favored Twin City. *See id.* at 1001–1002. Therefore, *Vonachen* does not support CapWealth's position that "in any way related to" renders the Policy, via the Exclusion, ambiguous. In fact, *Vonachen* appears to favor the Court's finding that "in any way related to" is not an ambiguous phrase in light of the Policy when

---

[14] Stephanie Schoenwolff is the underwriter for the Policy. (Doc. No. 46 at 7).

[15] The Court exercises its discretion to consider the CapWealth's argument raised in the footnote, though it notes that courts generally may disregard such arguments as insufficiently raised. *Gate Guard Services L.P. v. Perez*, 14. F. Supp. 3d 825, 834 (S.D. Tex. 2014).

viewed as a whole. And even if the precise outer reaches of the phrase "related to" tend to be debatable, the phrase is undeniably very broad when not somehow verbally reigned in. As Justice Alito noted not long ago:

> The "ordinary meaning" of the phrase "relate to" "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 119 L.Ed.2d 157 (1992). Applying that phrase "according to its terms [is] a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc.*, 519 U.S. 316, 335, 117 S. Ct. 832, 136 L.Ed.2d 791 (1997) (Scalia, J., concurring). To rein in this phrase, limits must be found, and the Court assures us that "relate to," as it now uses the concept, "incorporates real limits." *Ante,* at 1026. But without any indication what those limits might be, I doubt that the lower courts will find that observation terribly helpful. Instead, what limits the potentially boundless reach of "relate to" is just the sort of rough causal connection I have described.

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1033–34 (2021) (Alito, J., concurring). The point in the present case is not that the Policy is rendered unambiguous by the phrase "related to" as to its exact boundaries. The point instead is that the phrase "related to"—especially when modified by "in any way"—is unambiguously broad enough to apply to the "claim"—the SEC's action—against CapWealth, Pagliara, and Murphy. *See Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 277 (2d Cir. 2000) ("The fact ... that terms of a policy of insurance may be construed as ambiguous where applied to one set of facts does not make them ambiguous as to other facts which come directly within the purview of such terms.") (internal quotation marks omitted); *See Procraft Cabinetry, Inc.*, 348 F. Supp. 3d at 761 ("[L]anguage in a contract must be construed in the context of that instrument in the whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.") (internal quotation marks omitted).

This Court is not the first to be confronted with language of the type contained in the Exclusion (*i.e.* "in any way related"). Indeed, several courts have found that similar language

contained in insurance policy exclusions to be unambiguous in light of the facts of the respective case. *See Clark School for Creative Learning, Inc. v. Philadelphia Indem. Ins. Co.*, 734 F.3d 51 (1st Cir. 2013) (finding that the phrase "in any way involving" contained in a policy exclusion was clear and therefore not ambiguous); *Coregis Ins. Co. v. American Health Foundation, Inc.*, 241 F.3d 123, 129 (2d Cir. 2001) (holding that the "ordinary meaning of the broad term 'related to' as used in the Provision is clear and unambiguous in its application to exclude [] coverage. . . We note that the fact that a term is broad in scope does not necessarily make it ambiguous."); *W3i Mobile, LLC*, 632 F.3d 432 (holding the phrase "in any way involving" contained in policy exclusion is unambiguous).

The Court is satisfied that the Policy is not rendered ambiguous due to the inclusion of the phrase "in any way related to" in the Exclusion when viewed in light of the facts and circumstances of this case. The meaning of the phrase is unambiguous in this particular context—*i.e.* it unambiguously applies to CapWealth's request for coverage for the SEC investigation and enforcement action. The Exclusion bars coverage for "Loss for Any Claim" "in any way related to" CWIS, which has the same meaning as "in reference to" or "associated with." CapWealth has not supplied a reasonable alternative interpretation to support its position that the phrase is ambiguous as applied to the claim here at issue; by contrast, its purported interpretation is contrary to the ordinary meaning of the words "related to," introduces surplusage, and renders the Exclusion meaningless.

As suggested above, the Court realizes (even if the parties do not explicitly convey their own realization) that even if the Exclusion itself suggests that the ambiguity question (as defined above by the Court) should be answered in the negative, other parts of the Policy conceivably could dictate that it be answered in the positive. But the Court sees nothing in the other parts of

the Policy that would change the result dictated by the provision (the Exclusion) that is of primary probativeness on this question.[16]

In short, the Policy as a whole is ambiguous on the issue of whether the Policy excludes coverage for the claim at issue (the SEC investigation and enforcement action). The Court therefore cannot rely on extrinsic evidence to resolve that question. Instead, the Court must next decide whether the Policy bars the claim on the basis that the claim is "in any way related to" CWIS such as to entitle Twin City to summary judgment.[17]

C. The Claim is Related to CWIS

Twin City argues that the claim falls squarely within the meaning of being in "any way related to" CWIS. As explained by Twin City "the basis for the alleged conflicts of interest" underlying the SEC investigation and enforcement action "is [CapWealth's, Pagliara's, and Murphy's] affiliation with CWIS and resulting receipt of 12b-1 fees." (Doc. No. 43 at 15).

The Sixth Circuit's analysis in an analogous case, *US HF Cellular Commc'ns, LLC v. Scottsdale Ins. Co.*, 776 F. App'x 275, 288 (6th Cir. 2019), is instructive here. In *US HF*, the plaintiffs brought an action in federal court alleging that the defendant-insurance company

---

[16] For example, as discussed below, CapWealth argues that the Policy's coverage provisions would be illusory if the Exclusion were deemed applicable to the claim here at issue. This argument, if accepted, would tend to suggest that even if the Exclusion *considered alone* unambiguously excludes coverage for the claim, the *Policy as a whole* may be ambiguous as to whether coverage is excluded because its coverage provisions (if treated as non-illusory, as they should be) dictate that the claim *not* be excluded. But the Court rejects this argument below, and it does not see any other basis for saying that other Policy provisions suggest an affirmative answer to the ambiguity question.

[17] The Court realizes that it has already previewed its answer to this (second) question. That is, the Court has made clear that it has answered the ambiguity question in the negative because it finds that the Policy unambiguously excludes coverage for the claim here at issue. But applicable caselaw for whatever reason directs the Court to separately address whether the Policy unambiguously excludes coverage for the claim here at issue, and so the Court will do so; in so doing, the Court will address additional points—all of which favor Twin City—that it could have made above to further support its negative answer to the ambiguity question but has chosen to address in answering this second question.

breached its duty under the insurance policy when it refused to defend plaintiffs in a lawsuit in Alabama. *See id.* at 277. The defendant-insurance company denied coverage to US HF on the grounds that the claim[18] was reported later than sixty days after the end of the policy period in contravention to a provision contained in the insurance policy. *See id.* at 278–279. After the district court granted summary judgment in favor of the defendant-insurance company, the plaintiffs appealed. *See id.* at 279.

On appeal, one issue considered by the Sixth Circuit was whether an exclusion contained in the insurance policy for plaintiff Global Wideband HF Net LLC (the "Global Policy") barred coverage for the Alabama lawsuit. *See id.* at 288. The Global Policy contained a provision that excluded coverage for "any Claim" "in any way involving" "inaccurate statements" or misrepresentations that were contained in the application for the insurance policy. *Id.* at 284–285. In filling out the application, a director of Global checked a box "No" on the application to indicate that no applicant or any person proposed for the insurance plan had been subject to any civil litigation in the last three years. *See id.* at 285. This, however, was inaccurate because Global had been implicated by the Alabama lawsuit. *See id.* at 288.

The Sixth Circuit found that the claim at issue involved the relevant misrepresentation (*i.e.* checking "No") for several reasons. First, there was the "obvious connection" that the existence of the Alabama lawsuit was what rendered the director's "No" a misrepresentation. *See id.* at 289. Second, the court explained that the underlying allegations in the Alabama lawsuit directly implicated Global, and therefore the claim related to the director's misrepresentation. *See id.* In

---

[18] "Claim" as defined in the relevant policies in *US HF*, included "a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading." *See US HF Cellular Commc'ns*, 776 F. App'x 282–283. Thus, "claim" in *US HF* had a similar meaning as to the meaning of "claim" used in this case and herein, except that it referred to a civil proceeding rather than an administrative action.

other words, because the misrepresentation indicated that no applicant or person proposed for the insurance plan had been involved in a civil litigation, but Global was directly implicated by the Alabama lawsuit for which it now sought coverage, the claim evidently involved "in any way" (and, for that matter, involved in *some* way) the misrepresentation that Global was *not* involved in a civil litigation in the last three years. *See id.*

Here, Twin City contends that

"[a]bsent [CapWealth's, Pagliara's, and Murphy's] relationship with CWIS, the Insureds would not have received any 12b-1 fees. As such, there would have been no conflicts of interest to disclose. Nor would there be any basis for the SEC to argue that, based on this conflict of interest, [CapWealth, Pagliara, and Murphy] placed or held their clients in higher-cost shares subject to 12b-1 when lower cost shares were available. . .."

(*Id.*). The Court agrees with Twin City that the claim is plainly "in any way related" to CWIS. The SEC complaint for the enforcement action alleges that Pagliara and Murphy, as registered representatives of CWIS, collected 12b-1 fees due to their affiliation with CWIS. (Doc. No. 42-14 at 3). As Twin City explains, although CapWealth disputes the SEC's legal position (*i.e.* that a conflict of interest existed or that the disclosures were inadequate), CapWealth does not dispute that Pagliara and Murphy, as representatives of CWIS, received 12b-1 fees. (Doc. Nos. 43 at 8, 47 at 11).

The relationship between the claim and CWIS is likely even more direct than that between the claim at issue in *US HF* and the misrepresentation that was contained in the insurance application in *US HF*. In *US HF*, the Alabama lawsuit implicated Global but Global was not a named party to the state litigation, and there was no indication that the Alabama lawsuit would not have been filed absent Global's involvement. *See US HF Cellular Commc'ns*, 776 F. App'x at 289. By contrast, the SEC investigation and enforcement action for which CapWealth seeks coverage most likely would not have occurred absent Pagliara's and Murphy's affiliation with

CWIS that permitted them to collect 12b-1 fees. Although the court in *US HF* was analyzing the language "involved in any way," while the Exclusion here states "in any way related to," the Court is satisfied that *US HF* is instructive in the present context. The Court therefore finds that claim at issue in this case is "in any way related to" (which is to say that it is in *some* way related to) CWIS. Indeed, it appears to the Court that CWIS—as the entity through which Pagliara's and Murphy's affiliation permitted them to retain 12b-1 fees—is strongly related, even central to, the claim.

Perhaps acknowledging that the claim is related to CWIS under the ordinary meaning of "in any way related to," CapWealth argues that the Wells Notices themselves do not relate to CWIS. (Doc. No. 46 at 17). CapWealth asserts the "Claim" is the "Wells Notice" and the "Wells Notice" "does not concern or relate to CWIS in any respect." (*Id.* at 18). CapWealth makes this argument on a few occasions in its brief, but each time the argument boils down to the same basic principle—that because the "Claim" is the Wells Notice, and the Wells Notice does not explicitly mention CWIS, the Wells Notice cannot be said to "relate to" CWIS.

But the "Claim" is *not* the "Wells Notice." The Policy defines "Claim" to "include, in any relevant part, any" "administrative or regulatory proceeding against, or investigation of any Insured *commenced by.* . . the filing of a . . . Wells Notice . . . ." (Doc. No. 47 at 13–14) (emphasis added). CapWealth's attempt to limit the scope of the claim to the information contained in the Wells Notice in order to avoid the far-reaching application of the Exclusion is therefore clearly foreclosed by the definition of "Claim" contained in the policy. Even assuming *arguendo* that the Wells Notice were the "Claim" (which it is not), CapWealth's argument that the Wells Notices were not related to "CWIS in any manner" but rather "were related to alleged violations of the Advisors Act," (Doc. No. 46 at 22) is simply not supported by the undisputed factual record. As the Court has explained repeatedly, the SEC investigation and enforcement action were

inextricably linked to Pagliara's and Murphy's affiliation with CWIS which in turn allowed them to collect 12b-1 fees.

In summary, consistent with the broad scope of the words "in any way related to" and the Sixth Circuit's analysis in *US HF*, the Court finds that the claim is "in any way related to" CWIS and thus falls within the Exclusion.

D. The Court's Interpretation of the Exclusion Does Not Render the Policy Illusory

CapWealth argues that Twin City's interpretation of the Exclusion renders the Policy illusory because "any claim asserted against CapWealth will invariably involve securities for which CWIS acted as an introducing broker dealer." (Doc. No. 46 at 25). Therefore, according to CapWealth, finding that the claim is "in any way related" to CWIS would make it so the Exclusion effectively bars coverage for any request for coverage brought by CapWealth under the Policy. (*Id.*)

"A promise is illusory when it fails to bind the promisor, who retains the option of not performing; an illusory promise is not consideration for a return promise, and so cannot be the basis for finding a contract." *See German v. Ford*, 300 S.W. 3d 692, 705 (Tenn. Ct. App. 2009). It is a fundamental principle of contract interpretation that "[c]ourts [should] avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract . . .." *See Tackett v. M&G Polymers USA, LLC*, 811 F.3d 204, 208 (6th Cir. 2016) (citing *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 933–37 (2015)). As other courts have observed, "[a]n insurance policy is illusory if it is basically valueless to the insured because the insured would not recover benefits under any reasonably expected set of circumstances." *See Scottsdale Insurance Company v. Central Hotel, Inc.*, 4-21-cv-00052, 2022 WL 4468406, at *8 (S.D. Ind. Sept. 26, 2022) (internal quotation marks omitted). "If a policy is illusory, courts will

not enforce the policy based on its terms and must instead enforce it to satisfy the reasonable expectations of the insured." *See id.* (internal quotation marks omitted).

Though the Court acknowledges CapWealth's concern that the Policy will be rendered illusory, the Court's holding today is a narrow one. The Court finds only that under the present facts and circumstances, the claim is "in any way related to" CWIS, which in turn excludes CapWealth's request for coverage under the Policy. In this case, the SEC investigation and enforcement action were directly based on Pagliara's and Murphy's affiliation with CWIS. Because this case involves a direct relationship between the claim at issue and CWIS, the Court need not reach the question of whether a claim with an attenuated relation to CWIS, or other excluded entity, would be barred by the Exclusion. Given the Court's narrow holding on these particular set of facts, the Court finds that the Policy is not rendered illusory.

The Court acknowledges that CapWealth will be disappointed by the Court's decision. The ultimate duty of the Court is to enforce the words of the contract (the Policy) as written. And as discussed, when a contract is unambiguous, the Court must look to the text to arrive at an interpretation it deems consistent with the intention of the parties. Ultimately, "[a]lthough [CapWealth] may regret the terms that it plainly agreed to, [a]bsent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." *See International Technologies Marketing, Inc. v. Verint Systems, Ltd.*, 157 F. Supp. 3d 352, 364–365 (S.D.N.Y. 2016).[19]

---

[19] Because the Court finds that the Policy excludes the coverage CapWealth requested, the Court need not address CapWealth's argument that Twin City denied coverage in bad faith.

<u>CONCLUSION</u>

The Policy as a whole is unambiguous as to whether it excludes coverage for the claim here at issue, *i.e.*, the SEC's investigation and enforcement action. In particular, it unambiguously excludes coverage.

This is primarily because the Exclusion unambiguously excludes coverage for the claim. But it is also because nothing else in the Policy creates any ambiguity as to whether such coverage is precluded, let alone suggest that coverage is *not* excluded.

For the reasons stated herein, Twin City's Motion at Doc. No. 42 for summary judgment is GRANTED. This is the final order in the case. The Clerk is DIRECTED to close the case file. All relief being denied, the Clerk of the Court is ordered to enter final judgment under Federal Rule of Civil Procedure 58.

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE